OPINION
This appeal is taken by plaintiff-appellant Sueellen Mazurowski, the personal representative of Lisa Lynch (Mazurowski) from the judgment of the Court of Common Pleas of Auglaize County granting summary judgment to defendants-appellees the Auglaize County Dept. of Human Services ("ACDHS"), Kellie Salisbury ("Salisbury"), Pamela Fledderjohann ("Fledderjohann"), and Nancy Myers ("Myers").
On June 15, 1995, the police responded to a disorderly conduct complaint at the home of Scott Lynch ("Scott"). The police found Joanne Lynch ("Joanne") breaking out the window of Scott's car with a crowbar. Scott told the police that Keri had a cigarette burn from one of Joanne's friends and that he thought Joanne was not properly caring for Keri and Lisa. The police reported the incident to ACDHS.
On June 16, 1995, ACDHS received multiple reports that Joanne was abusing Keri by spanking her and burning her with cigarettes. Myers contacted Scott and Joanne and arranged times to speak with them. Joanne, the girls, and Joanne's mother, Evonne, arrived at ACDHS for the interview. Joanne told Myers that she and Scott were separating and that she and the girls were living with Evonne in Allen County. Joanne also told Myers that she did not spank Keri and that the cigarette burn was accidental. Myers interviewed Keri who told her that Joanne had spanked her, but indicated that the burn occurred when she ran into Angie Hatfield's, Joanne's friend, cigarette. After a thorough physical examination of both Keri and Lisa, Myers found no evidence of any physical abuse. Joanne was allowed to leave with the girls.
On June 19, 1995, Myers met with Scott. He confirmed that he and Joanne were separating, and indicated that he was concerned that Joanne was not caring for the kids well. He also indicated that he did not believe Joanne was properly feeding Lisa. Later that day, Myers interviewed Angie, who stated that her cigarette had burned Keri when Keri bumped into her.
On July 6, 1995, Jack Lynch, Scott's father, called Myers to report that Joanne had brought Keri to Shannon's house in a filthy state. Jack stated that Keri looked as if she had not bathed recently and as if she had not slept in a while. Jack also reported that Joanne was no longer living with Evonne, but had returned to Wapakoneta. Myers confirmed the move to Wapakoneta with Evonne. Myers eventually learned that Joanne had moved to 509 Kay Street in Wapakoneta when Joanne applied for food stamps.
On July 11, 1995, Myers paid an unannounced visit to the house at Kay Street. Joanne told her that she intended to remain in Wapakoneta. Myers checked on the girls and noted that Joanne and the girls seemed to be interacting well. Myers did not meet with anyone else in the household. On that same day, Myers attempted to contact Shannon Triplett, Joanne's friend, for information about the children, but could not reach her. Myers then contacted Jack and informed him of the status of the case. Jack told her to keep trying to reach Shannon.
On July 12, 1995, Myers attempted to contact Joanne to get a mailing address. When she received no response at the Kay Street address, Myers called Evonne. Evonne told her to send any correspondence to the Elida address. Myers then completed the central registry closing sheet on the initial complaint of abuse. Based upon the evidence before her at that time, Myers found the claim of abuse of Keri to be unsubstantiated.
On July 14, 1995, the receptionist at ACDHS received a report from Kevin Lynch, Scott's brother, that Joanne and the girls were living in hotels. Myers had already left the office for the day, so the report was given to Fledderjohann, the director of ACDHS. Upon receiving the report, Fledderjohann recalled that the disposition letter had been sent to Allen County. Thus, Fledderjohann made a referral to Allen County.
On July 15, 1995, at approximately 2:20 a.m., Jack called ACDHS and reported that Lisa was being taken to the hospital and that he suspected neglect. Upon examination at the hospital, Dr. Liggett discovered signs of retinal hemorrhaging and determined that Lisa was the victim of child abuse. Keri was then taken to the hospital and examined by a doctor for signs of abuse. The examination of Keri showed no signs of abuse. On July 16, 1995, Lisa was removed from life support and pronounced dead. Joanne's boyfriend, Jeff Hatfield, confessed to shaking Lisa and was arrested.
On July 15, 1997, Mazurowski filed a complaint alleging that ACDHS, Myers, Fledderjohann, and Salisbury are liable for Lisa's death. The basis for the claim is that ACDHS did not properly investigate the abuse charges and thus is responsible for her death. On September 26, 1997, ACDHS filed its answer on behalf of itself and the other defendants. The answer denied the allegations of the complaint and claimed statutory immunity. On April 30, 1998, ACDHS filed a motion for summary judgment. On December 10, 1998, the trial court granted ACDHS' motion for summary judgment. It is from this judgment that Mazurowski appeals.
Mazurowski raises the following assignments of error.
 Appellees are not entitled to immunity under R.C. 2744.02 or 2744.03 because appellees failed to follow the mandatory provisions of R.C. 2151.421, its supporting regulations, and the Auglaize County Plan of Cooperation.
 The individual appellees are not entitled to immunity under R.C. 2744.03(A)(6).
 Sovereign immunity, as applied to political subdivisions, violates Art. I § 5 and § 16
of the Ohio Constitution and is thus not a valid defense for the appellees' actions.
 The trial court erred in granting appellees' motion for summary judgment on appellant's claim under 42 U.S.C. § 1983.
 The trial court erred in denying appellant's request for declaratory judgment.
When reviewing the ruling on a motion for summary judgment, an appellate court reviews the judgment independently and does not defer to the trial court. Midwest Specialties, Inc. v. FirestoneTire Rubber Co. (1988), 42 Ohio App.3d 6, 536 N.E.2d 411. Civ.R. 56(C) sets forth the standard for granting summary judgment. Summary judgment is appropriate when the following have been established: 1) that there is no genuine issue as to any material fact; 2) that the moving party is entitled to judgment as a matter of law; and 3) that reasonable minds can come to but one conclusion and, viewing the evidence most strongly in favor of the nonmoving party, that conclusion is adverse to the nonmoving party. Bostic v. Connor (1988), 37 Ohio St.3d 144,524 N.E.2d 881.
In the first assignment of error, Mazurowski claims that ACDHS is not immune under R.C. 2744.02 or R.C. 2744.03. Generally, political subdivisions are not liable in damages from civil actions for injury or death allegedly caused by any act or omission by the political subdivision or an employee of a political subdivision in connection with a government function. R.C. 2744.02(A)(1). The operation of a human services department is defined as a governmental function. R.C. 2744.01(C)(2)(m). Although a human services department is not a political subdivision, it is the instrumentality by which a political subdivision carries out a governmental function. Wilson v. StarkCounty DHS (1994), 70 Ohio St.3d 450, 639 N.E.2d 105. Thus, the immunity of the county as a political subdivision is extended to the department of human services. Id.
Here, Mazurowski argues that ACDHS is not entitled to immunity because it was expressly made liable by R.C. 2151.421(G). Mazurowski argues that
 R.C. 2151.421 does more than limit liability. As recognized by the Ohio Supreme Court, this section also imposes a duty on children services agencies to investigate reported instances of abuse and to protect abused and neglected children. See, Brodie v. Children Services Bd.
(1990), 51 Ohio St.3d 112, 117.
Appellant's Brief, 11. However, this argument is not supported byBrodie. In Brodie, the Court held that the agency might be liable if its employees were negligent in providing services to an identified neglected or dependent child. Brodie v. Summit CtyChildren Svcs. Bd. (1990), 51 Ohio St.3d 112, 554 N.E.2d 1301. However, the Court also stated as follows:
 R.C. Chapter 2744 limits tort liability of political subdivisions to certain specified circumstances. The chapter outlines the circumstances under which a political subdivision can and cannot be held liable for its acts or the acts of its employees. See R.C. 2744.02 and 2744.03.
Id. at Fn. 6. Brodie did not apply the statute because it became effective only after the claim arose. In this case, the claim arose after the effective date, so the statute and not the holding of Brodie is controlling.
Mazurowski claims that ACDHS is liable because liability is imposed by R.C. 2151.421.
 [A] political subdivision is liable for injury, death, or loss to persons or property when liability is expressly imposed upon the political subdivision by a section of the Revised Code . . . . Liability shall not be construed to exist under another section of the Revised Code merely because a responsibility is imposed upon a political subdivision or because of a general authorization that a political subdivision may sue and be sued.
(Emphasis added.)
R.C. 2744.02(B)(5), R.C. 2151.421(F) requires the agency receiving a report of abuse to investigate the allegation within 24 hours. Immunity is granted for any actions taken in the investigation or the subsequent judicial proceedings. R.C. 2151.421(G)(6). However, R.C. 2151.421 does not expressly impose liability on a political subdivision for failure to comply with its requirements or those of any supporting regulations. Thus, the exception to immunity provided by R.C. 2744.02(B)(5) does not apply. "[E]xcept as specifically provided in R.C. 2744.02(B)(1), (3), (4) and (5), with respect to governmental functions, political subdivisions retain their cloak of immunity from lawsuits stemming from employees' negligent or reckless acts." Wilson v. Stark Cty.Dept. of Human Svcs. (1994), 70 Ohio St.3d 450, 452,639 N.E.2d 105, 107. Since ACDHS is immune from liability under R.C.2744.02, we need not discuss whether the defenses of R.C. 2744.03
apply. ACDHS, as an extension of the county, is entitled to immunity and the first assignment of error is overruled.
The second assignment of error claims that the individual appellees are not entitled to liability under R.C. 2744.03, which provides the defenses or immunities of the employee. Mazurowski bases this claim upon R.C. 2744.03(A)(6), which states as follows:
 In addition to any immunity or defense referred to in division (A)(7) of this section and in circumstances not covered by that division, the employee is immune from liability unless one of the following applies:
 (a) His acts or omissions were manifestly outside the scope of his employment or official responsibilities;
 (b) His acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner;
 (c) Liability is expressly imposed upon the employee by a section of the Revised Code. Liability shall not be construed to exist under another section of the Revised Code merely because that section imposes a responsibility or mandatory duty upon an employee, because of a general authorization in that section that an employee may sue and be sued, or because the section uses the term "shall" in a provision pertaining to an employee.
Mazurowski claims that the individual appellees conducted the investigation in a wanton or reckless manner and because liability is imposed by R.C. 2151.421. As was discussed above, R.C.2151.421 does not expressly impose liability upon the employee for failure to comply with its provisions. Thus, R.C.2744.03(A)(6)(c) does not apply. This leaves the question of whether the employees acted wantonly or recklessly while conducting this investigation.[1]
To act wantonly and recklessly, one must have reason to know of facts that would cause a reasonable person to believe that his or her conduct would create an unnecessary and unreasonable risk of physical harm. Thompson v. McNeill (1990), 53 Ohio St.3d 102,559 N.E.2d 705. Wanton misconduct is the failure to exercise any care whatsoever. Fabrey v. McDonald Village Police Dept. (1994),70 Ohio St.3d 351, 639 N.E.2d 31. "[M]ere negligence is not converted into wanton misconduct unless the evidence establishes a disposition to perversity on the part of the tortfeasor." Roszmanv. Sammett (1971), 26 Ohio St.2d 94, 96-97, 269 N.E.2d 420, 422.
Here, the individual appellants investigated the initial allegations within 24 hours of receiving the report. Myers went to the Lynch's home. She brought Joanne, Evonne, Keri and Lisa into the agency office and questioned them. She had Joanne disrobe Keri and Lisa so that she could look for any physical signs of abuse. The examination showed no marks on Lisa and one small red bump, which Myers determined to be a mosquito bite, on Keri. This examination did not support the allegations that Joanne was putting cigarettes out on the girls or that she was beating Keri. Myers also spoke with Scott concerning the care of the girls. She learned that Joanne and Scott were in the process of getting a divorce with a possible custody battle in the offing. Scott also told Myers that Joanne was a good mother, though he believed that she disciplined the girls too much. Jack later called to tell Myers that he thought Joanne was neglecting the girls, but he did not have an address where Myers could find Joanne and she was no longer at the address given. As soon as Myers learned Joanne's address, she went there for an unannounced visit. Once again, Myers saw two healthy, well-adjusted children playing with their mother. The girls looked well cared for, were appropriately dressed, and were clean. Keri spoke with Myers and indicated that she was fine. There were no marks on Keri to indicate abuse.
The next report of abuse came on July 14, 1995, a Friday afternoon. Since Myers had already left the office for the day, Fledderjohann was forced to deal with the case with the file and knowledge at hand. Because of a misunderstanding, Fledderjohann thought Joanne had moved back to Allen County and therefore referred the case there. At approximately 2:20 a.m., on July 15, 1995, less than twelve hours after the second report of possible neglect was made, Jack called to report that Lisa had been taken to the hospital. This was the first report of physical abuse towards Lisa. Tragically, Lisa was taken off life support and died on July 16, 1995. Upon the finding that Lisa had been abused, the agency took steps to immediately protect Keri, including having a doctor examine her for signs of prior abuse. The doctor's report indicated no signs of prior physical abuse. The report also indicated that Keri seemed to be a bright, well-adjusted girl who was developmentally on target for a child her age. Although Myers did not speak to all leads given her, her investigation of the alleged abuse was not reckless. Based upon the circumstances and the physical evidence she had before her, her finding that the claims of physical abuse were unsubstantiated was not unreasonable. Additionally, Lisa was not the child identified as the one being physically abused. However, Myers did examine Lisa as well as Keri to satisfy herself that no abuse was occurring. Despite the tragic ending of the investigation, as a matter of law the individual defendants did not act in an unreasonable or perverse manner. The second assignment of error is overruled.
In the third assignment of error, Mazurowski claims that sovereign immunity, as applied to political subdivisions is unconstitutional. The issue of the constitutionality of Chapter 2744 of the Revised Code was addressed in Fabrey, where the Supreme Court stated as follows:
 Where neither a fundamental right nor a suspect class is involved, a legislative classification passes muster if the state can show a rational basis for the unequal treatment of different groups . . . . The Supreme Court of the United States has articulated the test thus: "A statutory discrimination will not be set aside if any state of facts reasonably may be conceived of to justify it." . . . The court has alternately stated that in the absence of a suspect class or fundamental right, legislative distinctions are invalid only if they bear no relation to the state's goals and no ground can be conceived to justify them . . . .
* * *
 R.C. 2744.02(B)(4) involves neither a fundamental right nor a suspect class. No authority of which we are aware has held the right to sue a political subdivision for the negligence of its employees to be a fundamental right. To the contrary, the traditional rule has been the doctrine of sovereign immunity, which historically has negated the right to sue the state without its permission.
 Nor does the statute burden a suspect class . . . . The statute applies evenly across every personal classification that has evinced heightened scrutiny, such as race, national origin, religion, and sex . . . .
 A primary purpose of R.C. Chapter 2744 is to preserve the fiscal resources of political subdivisions . . . . The Supreme Court of the United States has declared that the preservation of fiscal integrity is a valid state interest . . . .
* * *
 Appellants argue also that R.C. 2744.02(B)(4) violates the Due process Clauses of the Ohio and United States Constitutions. Under the Ohio Constitution, an enactment comports with due process "if it bears a real and substantial relation to the public health, safety, morals or general welfare of the public and if it is not unreasonable or arbitrary." . . . Federal due process is satisfied if there is a rational relationship between a statute and its purpose . . . . Applying this standard, the Supreme Court held constitutional a state statute that provided immunity to the state and its parole officers from liability stemming from determinations of whether to grant parole . . . . In Martinez, a parolee murdered an innocent third party after the parole board, having failed to observe certain procedures, released him. The Supreme Court reasoned that the grant of immunity to the state and the parole officers satisfies due process because it "rationally furthers a policy that reasonable lawmakers may favor." . . . The court's analysis in Martinez, and our analysis under the equal protection law, compel us to hold that R.C. 2744.03(B)(4) does not violate the due process provisions of the Ohio or United States Constitutions.
 Appellants argue finally that R.C. 2744.03(B)(4) violates § 16, Art. I of the Constitution of Ohio. Section 16, Art. I states: "All courts shall be open, and every person, for an injury done him in his land, goods, person, or reputation, shall have remedy by due course of law, and shall have justice administered without denial or delay.
 "Suits may be brought against the state, in such courts and in such manner, as may be provided by law."
 Appellants argue that § 16, Art. I endows them with a fundamental right to sue a political subdivision for damages for the negligence of its employees. We do not agree. This court has held that the clause permitting suits to be brought against the state is not self-executing, and that the state of Ohio is not subject to suits in tort without the consent of the General Assembly . . . . The General Assembly in enacting R.C. Chapter 2744 has used [its] power to create a scheme for immunity and liability of political subdivisions. Because the General Assembly has the power to define the contours of equal protection and due process, the right to sue the state is not fundamental.
* * *
 Cases in which we have invalidated statutes and rules on the basis of § 16, Art. I have involved the serious infringement of a clearly preexisting right to bring suit . . . . The immunity of the defendants in this case is not such an infringement of a preexisting right. It is, rather, in accord with a traditional common-law principle. We hold, therefore, that R.C. 2744.02(B)(4) does not violate § 16, Art. I of the Constitution of Ohio.
Fabrey, supra at 353-355, 639 N.E.2d at 33-35 (citations omitted). In this case, Mazurowski argues that the right to sue a political subdivision is a fundamental right. The Supreme Court of Ohio has held that the General Assembly can limit the liability of a political subdivision and its employees. Thus, the third assignment of error is overruled.
The fourth assignment of error is that the trial court erred in dismissing Mazurowski's claim under 42 U.S.C. § 1983. However, the § 1983 claim is barred by R.C. 2744. The previous assignment of error addressed the constitutionality of the statute. Since the statute is constitutional, no claim can lie under § 1983. The fourth assignment of error is overruled.
The final assignment of error is that the trial court erred in overruling Mazurowski's motion for declaratory judgment. App.R. 16 provides in pertinent part:
 The appellant shall include in its brief, under the headings and in the order indicated, all of the following:
* * *
 (7) An argument containing the contentions of the appellant with respect to each assignment of error presented for review and the reasons in support of the contentions, with citations to the authorities, statutes, and parts of the record on which appellant relies.
App.R. 16(A). This assignment of error was not addressed in Mazurowski's brief. Since Mazurowski did not indicate either what the error is or why it is error, we need not review it. The fifth assignment of error is overruled.
The judgment of the Court of Common Pleas of Auglaize County is affirmed.
Judgment affirmed.
 HADLEY and WALTERS, JJ., concur.
[1] The question of whether the investigation was pursued with a malicious purpose or in bad faith is not alleged, and thus will not be discussed.